Curran, Dennis J., J.
Craig Vinch sued his former employers, Lown Cardiovascular Group, P.C. and Lown Cardiovascular Research Foundation and five shareholders, Shmuel Ravid, Brian Bilchik, Vikas Saini, C. Bruce Metzler, and Charles Blatt, individually and in their official capacities, for damages arising from his employment and eventual termination from the Lown Group and Lown Research Foundation.
Vinch alleges, as against all defendants, violation of the Massachusetts Wage Act G.L.c. 149 (count I), retaliation in violation of the Massachusetts Wage Act against the Lown Cardiovascular Group, Lown Cardiovascular Research Foundation, Bilchik, Blatt, Saini and Ravid (count II), breach of contract against the Lown Cardiovascular Group and Lown Cardiovascular Research Foundation (count III), fraud or intentional misrepresentation against the Lown Cardiovascular Group (count V), and promissory estoppel against the Lown Cardiovascular Group and Lown Cardiovascular Research Foundation (count VI).[2]
The matter is now before the court on the defendants’ motion for summary judgment on all counts. For the reasons set forth below, the defendants’ motion is ALLOWED in part and DENIED in part.
BACKGROUND
The following facts are construed in the light most favorable to Vinch, as the non-moving party.
Vinch’s relationships with the Lown Cardiovascular Group and Lown Cardiovascular Research Foundation began in 2001, when the Group and Foundation hired him as a Fellow, a position he held until June of 2004. During that Fellowship, Vinch received positive work evaluations, although some of the Lown Group physicians documented concerns about Vinch’s personality. After his Fellowship ended, Vinch continued to work for the Lown Group without a contract.
In May of 2005, Vinch signed a written, two-year contract to join the Lown Group on September 15, 2005 as an attending physician. Vinch asserts that during these contract negotiations, he spoke with Ravid about the possibility of becoming a partner. Vinch explains that it was his own decision not to continue partnership negotiations because he wanted to wait and' learn more about the atmosphere and interpersonal relationships at the Lown Group before making an equitable commitment. During his two-year employment at the Lown Group from September 2005 to September 2007, Vinch was also employed by the Lown Research Foundation. A separate written, two-year agreement covering the same time period governed his employment with the Lown Research Foundation.
Vinch’s employment at the Lown Group and Lown Research Foundation went relatively smoothly during this two-year period. Vinch worked to set up and establish a nuclear lab so that the Lown Group could conduct in-house nuclear tests for its patients. Vinch was named the radiation safety officer of this lab. Vinch was also named the medical director of the Group’s echocardiology lab. At this time, the echocardiology lab was not accredited, and Vinch worked toward obtaining its accreditation. The partners at the Lown Group were generally satisfied with his work in the practice and the lab, although they continued to have some concerns regarding his personality. Despite these alleged concerns, in May of 2008, the Lown Group signed another two-year employment agreement with him which governed the period from September of 2007 to August 31, 2009. Vinch did not sign another written agreement with the Lown Research Foundation after his September 2005 to September 2007 contract ended, although he continued to do some work for the Research Foundation based on the terms of his new contract with the Lown Group.
Vinch’s new employment agreement with the Lown Group gave him a raise, and beginning in September of 2008, provided that his “base compensation . . . shall be at the same rate as the Corporation’s shareholder employees’ . . . periodic base salary . . .” The contract also provided that Vinch begin receiving “incentive compensation” if and when the board of directors elected to make a distribution of profits to the Lown Group shareholders.[3] The employment agreement also contained a method and time-line by which the Lown Group, at its. sole discretion, could opt to make Vinch a partnership offer.
*544 In December of 2008, Bilchik orally informed Vinch that the Lown Group had decided to offer him partnership.[4] In March of 2009, it emailed Vinch to see whether he would accept their offer to become a partner. Vinch accepted the Group’s partnership offer by email in March of 2009. Partnership negotiations slowly progressed. During this period, Vinch’s May2008 contract continued to govern his relationship with the Lown Group; no subsequent agreement was signed.
In or around April of 2009, Vinch learned that the board of directors had voted to give the Lown Group shareholders a share of the Group’s profits. A distribution was made, but Vinch did not receive a share of the profits. The Lown Group contends that money was not distributed to Vinch because it earned the profits distributed at that time in a prior year, when Vinch was not bonus-eligible. Vinch complained to Saini about the shareholder’s decision not to pay him and called the shareholders “greedy bastards.”[5]
On June 19,2009, the Lown Group terminated Vinch under the “without cause” clause of his employment agreement. In accordance with this clause, Vinch was given 180 days notice before his work at the Lown Group actually terminated, meaning Vinch would continue to be employed by the Group until December 16, 2009. The Lown Group explained that it made the decision to terminate Vinch because he had had a conflict with another employee on June 12, 2009. The Group asserts that this incident was the last straw in a series of personality concerns they had about Vinch during his tenure with the Group.[6] The echocardiology lab, which Vinch had been working toward accrediting, was officially accredited on July22,2009, approximately four and a half weeks following his termination, but while Vinch was still working for the Lown Group.
On October 22, 2009, Vinch filed a non-payment of wage and workplace complaint with the Attorney General’s office. On November 12, 2009, Vinch supplemented his original complaint to include a claim that the Lown Group retaliated against him since learning of his complaint to the Attorney General. Among other things, Vinch alleged that the Group attempted to refer his patients to other physicians within the group, cut off his access to the Group’s IT system, attempted to get his privileges revoked at Brigham & Women’s Hospital, and attempted to dissuade a former Lown Group partner from providing him with a reference to assist him in obtaining new employment. Vinch also asserts that the Group continued to retaliate against him after his departure from the Group by failing to send along records at his patients’ request. Vinch filed this action on December 18, 2009.
DISCUSSION
I. Summaiy Judgment Standard
The court shall grant a motion for summaiy judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 399 Mass. 419, 422 (1983). The moving party bears the burden of showing the absence of a genuine issue of material fact on eveiy issue. Pederson v. Time,Inc., 404 Mass. 14,17 (1989). Amoving party may satisfy this burden by either submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991).
The non-moving party cannot defeat a motion for summary judgment by merely asserting that facts are in dispute. Mass.R.Civ.P. 56(e); LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Rather, to defeat summaiy judgment, the non-moving party must introduce evidence to prove the existence of a genuine issue for trial. Wooster v. Abdow Corp., 46 Mass.App.Ct. 665, 673 (1999). “Conclusoiy statements, general denials, and factual allegations not based on personal knowledge [are] insufficient.” Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n., 399 Mass. 886, 890 (1987), quoting Madsen v. Erwin, 395 Mass. 715, 721 (1985). All facts and inferences must be viewed in the light most favorable to the non-moving party. Attorney General v. Bailey, 386 Mass. 367, 370 (1982).
II. Massachusetts Wage Act
The general purposes of the Wage Act are “to assure that employees are paid their wages,” Commonwealth v. Savage, 31 Mass.App.Ct. 714, 714 (1991), and to “prevent the unreasonable detention of wages!,]” Boston Police Patrolmen’s Ass’n. v. Boston, 435 Mass. 718, 720 (2002). While the Act makes clear on its face that holiday pay, vacation pay, and commissions fall within its protections, the term “wages” is not otherwise defined. G.L.c. 149, §148. To prevail on Count I of his amended complaint, Vinch must establish conclusively that the contested incentive compensation payments are “wages” within the meaning of the Act.
The Supreme Judicial Court has held that discretion-aiy bonuses are not “wages” within the meaning of the Wage Act. See Weems v. Citigroup, Inc., 453 Mass. 147 (2009). Vinch asserts that the disputed incentive compensation was not “discretionaiy,” but rather was ascertainable, due, and owed once the shareholders themselves were paid. Assuming, without deciding, that Vinch was owed the disputed incentive compensation under the terms of his contract, this compensation still falls outside the parameters of the Wage Act.
The record reveals that the shareholders of the Lown Group only received additional compensation, of which Vinch is claiming a share, once the board of directors voted to make a distribution of funds. As such, the shareholders’ receipt of funds above and beyond their base salaries was not automatic, but rather, left to the board’s discretion. Because the initial distribution to the Lown Group shareholders was discretionary, Vinch’s claim to a portion of that money falls outside of the Wage Act, See McQueen v. *545 True Partners Consulting, LLC, 28 Mass. L. Rptr. 411 (2011) (finding that although a sum certain may have been owed to plaintiff as a result of a bonus distribution to the managing partners, the Wage Act did not apply to the monies claimed because the original distribution to the partners was discretionary). Accordingly, defendants are entitled to summary judgment on count I of Vinch’s amended complaint.
III.Retaliation under the Wage Act
UnderG.L.c. 149, §148A, it is illegal for an employer to penalize an employee for taking an action to enforce his rights under the wage and hours provisions of the Wage Act. “A complaint made to an employer (or a manager of the employer) by an employee who reasonably believes that the wages he or she has been paid violate [the Wage Act] readily qualifies as such an ‘action.’ ” Smith v. Winter Place, LLC, 447 Mass. 363, 367 (2006). Employer retaliation against the complaining employee is actionable. Id. at 364 n.4.
At this stage, Vinch has failed to produce any evidence that he complained of a violation of the Wage Act. The record reflects that in or around April of2009, Vinch learned from Saini that the Lown Group made a bonus distribution to its partners, but that Vinch would not be receiving a share. At or around that time, Vinch told Saini that he thought the partners were “greedy bastards” for failing to pay him a share of the distributed funds. The mere fact that Vinch disagreed with the partners’ decision not to give him a share of the monies and called them “greedy bastards” is not, as a matter of law, sufficient evidence that Vinch made a complaint under the Wage Act. Furthermore, even if Vinch’s statement to Saini was a “complaint” under the Wage Act, the record is void of evidence indicating a causal connection between Vinch’s comment to Saini and his termination nearly two months later. Therefore, Vinch’s retaliation claim cannot prevail and defendants are entitled to summaryjudgment on count II of Vinch’s amended complaint.[7]
IV.Breach of Contract
In order to prevail on a breach of contract claim, the plaintiff must prove that (1) there was an agreement supported by consideration; (2) he was ready, willing, and able to perform; (3) the defendant breached the contract; and (4) he suffered damages from the breach. Singarella v. Boston, 342 Mass. 385, 387 (1961). Interpretation of a written contract is ordinarily a question of law. Allstate Ins. Co. v. Bearce, 412 Mass. 442, 446-47 (1992). If, however, the language of the written contract is ambiguous, then the meaning of the contract is determined by the trier of fact. Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Mass., Inc., 79 Mass.App.Ct. 300, 307 (2011).
“An ambiguity arises from language susceptible of different meanings in the eyes of reasonably intelligent persons." Id., citing Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). To discern the existence of an ambiguity, the court must focus on the language of the contract. Id. The mere existence of an interpretive dispute between the parties is insufficient to find the existence of an ambiguity. Id.
It is undisputed that Vinch and the Lown Cardiovascular Group had a valid, enforceable agreement from September 15, 2007 to August 31 2009.[8] Vinch alleges that the Lown Group breached its duties in two ways. First, Vinch asserts that the Group breached the contract by failing to pay him at the same “rate” as the shareholders beginning in September of 2008. Second, Vinch claims that the Lown Group breached its contractual obligations when it failed to pay him “incentive compensation” during the fall of 2008 and spring of 2009.
Vinch’s argument that the Lown Group breached its obligation to pay him at the same “rate” as the shareholders fails. Section 111(a) of Vinch’s employment agreement states that “For the period commencing on September 1, 2008 and ending on August 31, 2009, [Vinch’s] base compensation... shall be at the same rate as the [Lown Group’s] shareholder employees’ . . . periodic base salary . . .” Based on a plain reading of the contract language, it appears that Vinch was entitled to the same base salary as the shareholders of the Lown Group. This section does not, however, entitle Vinch to the same total compensation or benefit compensation as the shareholders. Vinch does not assert that his base salary, exclusive of benefits or other perks, was below that of the shareholder employees. As such, this provision was not violated as a matter of law, and the Lown Group is entitled to summaryjudgment on this portion of Vinch’s breach of contract claim.
On the other hand, Vinch’s breach of contract claim arising from the Lown Group’s failure to pay him incentive compensation survives the Lown Group’s motion for summaryjudgment. Based on the language in the contract, Vinch is entitled to incentive compensation during two delineated time periods. The first period runs between September 1, 2008 and December 31, 2008; the second runs between January 1, 2009 and August 31, 2009. The parties dispute whether the language used in the contract means that Vinch is entitled to a share of monies collected by the Lown Group and paid out to shareholders during the specified time periods, or whether he is simply entitled to a share of the Lown Group’s accounts receivable accumulated during those time periods, which could be distributed to Vinch and shareholders upon a board of directors vote when the monies from those accounts are actually received. Because reasonable minds could differ as to the meaning of the incentive compensation provision of the May 2008 contract, the court leaves the determination of its meaning to the trier of fact.
V.Fraud or Intentional Misrepresentation
To sustain a claim of fraud or intentional misrepresentation, the plaintiff must prove that: (1) the defendant made a false statement of material fact with the intention of inducing plaintiff to act; and (2) he relied *546 on the false statement to his detriment. Zimmerman v. Kent, 31 Mass.App.Ct. 72, 77 (1991). The plaintiff must affirmatively prove fraud, because fraud will never be presumed. Steele v. Kelley, 46 Mass.App.Ct. 712, 739 (1999).
Vinch claims that in December of 2008, the partners of the Lown Group made him an unambiguous offer of partnership. Vinch argues that when this offer was made, the Lown Group did not actually intend to make him a partner, but rather offered him partnership as a means of ensuring that he continued working for the Group until the echocardiology lab was accredited. Vinch has failed to provide sufficient evidence in the record that the Group fraudulently made this partnership offer to induce him to continue his work at the Group. Rather, the record indicates that Vinch was contractually obligated to continue working at the Group until August 31, 2009. Assuming that Vinch himself was planning on keeping his contractual obligations, the Group did not have an incentive to offer Vinch partnership simply to induce him to continue working there through the accreditation of the laboratory.[9] By the terms of his own promise, Vinch was bound to continue his work during this period regardless of whether the partnership offer was made. The court will not infer, without additional evidence, that the Group made him an offer of partnership to induce him to uphold his contractual obligations. As such, the Lown Group’s motion for summary judgment as to count V of Vinch’s amended complaint is ALLOWED.
VI. Promissory Estoppel
In order to sustain a promissory estoppel claim, Vinch must prove that: (1) defendants made a representation to him intending to induce his reliance; (2) he took an act or refrained from acting in reasonable reliance on the representation; and (3) his act or omission caused harm. See Anzalone v. Administrative Office of the Trial Court, 457 Mass. 647, 661 (2010).
As discussed above, Vinch fails to provide the court with sufficient evidence at this summary judgment stage to sustain a finding that the Lown Group made him a partnership offer in an attempt to induce him to continue working for their practice. Because the record is void of facts sufficient to sustain such a finding, Vinch’s promissory estoppel claim must fail, and the Lown Cardiovascular Group’s motion for summary judgment as to count VI of Vinch’s amended complaint is ALLOWED.
ORDER
For these reasons, it is hereby ORDERED that the defendants’ motion for summary judgment is ALLOWED as to Counts I, II, V, and VI in their entirety. The defendants’ motion for summary judgment as to Count III is ALLOWED insofar as it concerns Vinch’s claim to payment at the same “rate” as shareholders, otherwise it is DENIED.

Vinch voluntarily dismissed his claim of “tortious interference with advantageous contractual relations” against Bilchik, Blatt, Ravid, and Saini (count IV) in his opposition to defendants’ motion for summary judgment.

Vinch was entitled to “Incentive Compensation earned as follows: (i) for the period commencing September 1, 2008 and ending on December 31, 2008, Employee shall be paid Incentive Compensation in an amount equal to fifty percent (50%) of the amount paid to each of the Shareholders based on the Shareholders being paid an equal share of profits of the Corporation, irrespective of the Corporation’s actual distribution profits to Shareholders; (ii) for the period commencing January 1, 2009 and ending on August 31, 2009, Employee shall be paid Incentive Compensation in an amount equal to eighty percent (80%) of the amount paid to each of the Shareholders based on the Shareholders being paid an equal share of profits of the Corporation . . . Incentive Compensation earned as provided under this Section 111(b) (i) and (ii) shall be paid to Employee simultaneously with distributions to the Shareholders, as determined by the Corporation’s Board of Directors as of April 30, August 31, and December 31 of each year.”

Vinch’s contract called for a partnership offer to be made in writing by January 1, 2009, and it called for certain documents to be delivered to Vinch along with the written offer. The fact that partnership was offered and accepted outside of the methodology articulated in the contract is not a central issue in this case.

Since the inception of this lawsuit, Vinch learned that the shareholders also received a profit distribution in the fall of 2008. Vinch did not receive a share of these profits, and again the Group contends that this was because the monies distributed at this time were earned during a period when Vinch was not bonus-eligible.

Vinch disputes the seriousness of the June 12th incident, and claims that the Group fired him in retaliation for his complaint regarding the non-payment of his incentive compensation.

Any claim of retaliation Vinch makes regarding the Lown Group’s actions following his complaint to the Attorney General also fails. The Lown Group asserts that all actions complained of, such as informing the Brigham and Women’s Hospital that he would no longer be affiliated with the Group, and failing to schedule new patients with Vinch, were taken due to Vinch’s impending departure from the Group. The summary judgment record reveals that a letter was sent to Vinch’s patients informing them that he was leaving the Group and providing patients with Vinch’s new contact information. The letter did not state that Vinch had been terminated. Vinch has failed to provide evidence that the Lown Group’s articulated reason for their actions was pretextual. Without evidence causally linking the Lown Group’s actions to Vinch’s complaint to the Attorney General, the defendants are entitled to summary judgment.

The Lown Cardiovascular Research Foundation was not a party to this contract. As such, Vinch cannot sustain a valid breach of contract claim against the Research Foundation and the Research Foundation is accordingly granted summary judgment on count III of Vinch’s amended complaint.

The court also notes that the record indicates that Vinch was eventually terminated before the formal accreditation of the echocardiology lab.